IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF WISCONSIN, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 21-cv-805 |
| v. | ) ) | |
| DEAN KNUDSON, JULIE M. GLANCEY, ROBERT F. SPINDELL, JR., MARK L. THOMSEN, ANN S. JACOBS, MARGE BOSTELMANN, in their official capacity as members of the Wisconsin Elections Commission, MEAGAN WOLFE, in her official capacity as the Administrator of the Wisconsin Elections Commission, | ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff League of Women Voters of Wisconsin ("Plaintiff" or "LWVWI") seeks declaratory and injunctive relief as follows:

### NATURE OF ACTION

1.     Two years ago, the Wisconsin Elections Commission ("WEC" or "the Commission") mailed letters to approximately 234,000 registered Wisconsin voters (about seven percent of the state's total number of registered voters at the time), telling them that the Commission had information suggesting they may have moved to a new residential address. That letter, however, did not inform those voters that if they failed to confirm their existing voter registration address or update to a new address, their registration would be deactivated. This dispositive fact is undisputed. The parties to this lawsuit agree that the mailing sent to the 2019 ERIC list voters "did not address potential deactivation as a consequence of not responding to the

mailing." *See* Defs.' Mot. to Dismiss, *League of Women Voters of Wisconsin, et al. v. Knudson*, 19-cv-1029-jdp (W.D. Wis.), dkt. 42 at 3.[1] Defendants made the same admission in 2019 when they were opposing the state court action, *State ex rel. Zignego v. Wisconsin Elections Commission*, which sought a writ of mandamus compelling the immediate deactivation of these voters. At the hearing on the motion for a writ of mandamus, Defendants' counsel stated that "[the 2019 ERIC letter] does not provide any notice of deactivation, in thirty days or otherwise . . . [a writ of mandamus] would change the status quo, deactivate registered electors without any notice."[2] Defendants' counsel added:

> [The 2019 ERIC letter] was not saying in thirty days you're gonna be deactivated, it wasn't saying at some point you're gonna be deactivated, it was saying here are the steps you can take to . . . update the voter rolls, help us update the voter rolls.[3]

It was this admitted failure to provide notice that prompted Plaintiff LWVWI to challenge the threatened deactivation of the 2019 ERIC list voters as a due process violation in this Court in December 2019.

2.   According to Defendants' representations to this Court in the previous, dismissed litigation, WEC's omission of any notice of deactivation was not an oversight. The WEC, by and through their counsel, informed this Court that it had "adopted no plan to deactivate any voter registrations." Dkt. 42 at 3. The Commissioners and their counsel told this Court in their successful motion to dismiss the prior lawsuit that the very reason "the mailing did not address potential deactivation as a consequence of not responding to the mailing" was "[b]ecause the Commission

---

[1] All record citations herein are to the prior lawsuit, 19-cv-1029-jdp.

[2] Ex. 1, Transcript of December 13, 2019 Hearing on Motion for Temporary Injunction or, in the Alternative, a Writ of Mandamus, *State ex rel. Zignego v. Wis. Elections Comm'n*, No. 2019CV449 (Ozaukee Cty. Cir. Ct.) ("*Zignego* Hr'g Tr."), at 59:23–60:2. All references to pages in exhibit numbers are to the page numbers affixed in the header upon electronic filing.

[3] *Id*. at 61:4–17.

had not approved deactivations[.]" *Id.* at 6. In its brief in opposition to the motion to dismiss, Plaintiff LWVWI laid out the evidence of WEC's actions at its June 2019 hearing and argued the record established that a deactivation plan had been adopted. *See* dkt. 57 at 1–5, 9–12. Only now— approximately a year and a half after they secured the dismissal of Plaintiff LWVWI's prior action as unripe—have the Commissioners and their counsel finally acknowledged that their representations were in error, and that a definitive deactivation plan had been approved and would result in deactivation after a waiting period of at most two years. *See* dkt. 64 (Letter from Wisconsin Department of Justice, Oct. 5, 2021).

3.      Defendants admitted this to the Court because on July 31, 2021, they completed that plan and deactivated the voter registrations of the 31,854 Wisconsin voters who remained on the 2019 ERIC list.[4] This action was taken despite the continued lack of notice of deactivation to those voters and not pursuant to any new vote of the Commissioners.

4.      Not only did Defendants admit that the 2019 letter did not constitute notice of potential deactivation, but they strongly suggested that any future deactivation would be preceded by said notice. *See* dkt. 42 at 3 ("[T]he Commission may well decide to give notice of any deactivations that may ultimately occur."). WEC represented to this Court that it "ha[d] said nothing about what notice will accompany deactivations, if any," indicating that a further letter containing notice might be approved and sent in the future, if deactivations were to move forward. *Id.* at 13. Now it is clear that no such notice was provided prior to the July 2021 deactivation of the remaining 31,854 voters on the 2019 ERIC list.

---

[4] Ex. 2, Wisconsin Elections Commission, Press Release, *Elections Commission Deactivates More Than 205,000 Voters*, Aug. 4, 2021, at 3–4, https://elections.wi.gov/sites/elections.wi.gov/files/2021-08/NR%20WEC%20Four-Year%20Maintenance%20Completed%2008-04-2021_0.pdf.

5.      Plaintiff LWVWI has filed this new action to redress the unlawful deactivation of those 31,854 registered Wisconsin voters. Each of those voters' registration records must be reactivated because they were not given notice of the consequence of failing to act in response to the 2019 ERIC letter—deactivation—and the deadline for taking such action. Such a deprivation of voters' statutory entitlement to their registration without notice and an opportunity to respond violates the Due Process Clause of the Fourteenth Amendment. Plaintiff LWVWI has been injured by this constitutional violation because it has been and will be forced to divert staff time, money, and other resources to provide notice to and re-register these unlawfully deactivated voters. LWVWI devotes resources to registering new voters in Wisconsin and updating voters' registration addresses to further its civic engagement and voter mobilization mission, but it would not be necessary to expend time, money, and resources contacting and re-registering these tens of thousands of voters but for Defendants' violation of due process.

6.      It is now undisputed that the WEC had an approved plan to deactivate these 2019 ERIC list voters. Indeed, Defendants have already carried out that plan. Further, it remains undisputed that the letter sent to the 2019 ERIC list voters "did not address potential deactivation as a consequence of not responding to the mailing" and did "not provide any notice of deactivation." *See* dkt. 42 at 3; *Zignego* Hr'g Tr. at 59:23–60:2. And it is undisputed that no notice was provided to these voters in the subsequent two years. Given these undisputed facts and Defendants' admissions, it inexorably follows that the right to due process has been violated and these deactivated voters must be reinstated.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8. This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

9. This Court has personal jurisdiction over Defendant-Commissioners Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr., the members of the Commission, and Meagan Wolfe, the Administrator of the Commission, who are sued in their official capacities. Defendants Knudson, Glancey, Thomsen, Jacobs, Bostelmann, Spindell, Jr. and Wolfe are state officials who reside in Wisconsin and work in Madison, Wisconsin.

10. Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Madison, Wisconsin. A substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

11. Plaintiff League of Women Voters of Wisconsin ("LWVWI" or "the League") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 612 West Main St., Suite 200, in the City of Madison, Dane County, Wisconsin. LWVWI is an affiliate of The League of Women Voters of the United States, which has 750 state and local Leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong. LWVWI works to expand informed, active participation in state and local government, giving a voice to all Wisconsinites.

12. LWVWI, a nonpartisan community-based organization, was formed in 1920, immediately after the enactment of the Nineteenth Amendment granting women's suffrage. LWVWI is dedicated to encouraging its members and the people of Wisconsin to exercise their

right to vote as protected by the Constitution and the Voting Rights Act of 1965. The mission of LWVWI is to empower voters and defend democracy. LWVWI does this by promoting political responsibility through informed and active participation in government and to act on selected governmental issues. The League seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.

13.     LWVWI impacts public policies, promotes citizen education, and facilitates the democratic process by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently, LWVWI has 20 local Leagues and approximately 2,680 members. LWVWI works with and through twenty local Leagues in the following cities, counties, and areas in Wisconsin: Appleton-Fox Cities, Ashland/Bayfield Counties, Beloit, Dane County, Door County, the Greater Chippewa Valley, Greater Green Bay, Janesville, the La Crosse area, Manitowoc County, Milwaukee County, the Northwoods, Ozaukee County, the Ripon area, Sheboygan County, the Stevens Point area, the St. Croix Valley, Waukesha County, the Whitewater area, Winnebago County, and the Wisconsin Rapids area.

14.     LWVWI began as an organization focused on the needs of women and training women voters. It has evolved into an organization concerned with educating, advocating for, and empowering all Wisconsinites. With members in nearly every county in the State, the LWVWI's local Leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and get-out-the-vote ("GOTV") efforts. LWVWI has developed the statewide Election Observation Program and the Vote411 voter guide for Wisconsin. It also conducts statewide voter registration trainings and engages in statewide voter registration and GOTV efforts.

15.     Members of local Leagues are members of LWVWI, as well as the national League of Women Voters, and their efforts and work are part of local, state, and national operations and done on behalf of the state and national Leagues. LWVWI offers guidance, resources, materials, trainings, and financing in support of the local Leagues and their activities, which include voter registration drives and, as can be seen from the information below regarding expenditures and other voter registration-related activities. LWVWI serves tens of thousands of voters, through in-person voter registration assistance to complete online and paper registrations. LWVWI distributes voter information in the form of thousands of flyers, information cards, guides, and stickers. LWVWI engages hundreds of thousands of individuals through its website and social media platforms. LWVWI believes that these efforts contribute to high voter engagement and turnout in Wisconsin elections. Finally, Plaintiff LWVWI is also committed to protecting all eligible Wisconsin voters' rights, including the League's members. That includes preventing unlawful removal from the voter rolls.

16.     From 2017 through 2019, to fulfill its mission to foster civic engagement and encourage voter participation, LWVWI made substantial investments in voter registration activities statewide. In each of those years, LWVWI incurred expenses to finance voter registration activities statewide.

17.     In 2017, LWVWI spent an estimated total of $9,739 on voter registration-related activities, comprising voter registration training ($1,960), creating voter information cards ($279), creating a MyVote training presentation ($1500), and adding and training additional staff ($6,000).

18.     In 2018, a year with midterm elections and statewide gubernatorial and Attorney General races, LWVWI spent approximately $11,295 on voter registration activities, including voter registration training for Access to Independence ($49), voter registration mobile app training

($980), voter registration social media-related activities ($784), voter registration information upgrade to the LWVWI.org website ($196), travel for voter registration activities ($463), voter registration-related postage ($23), GOTV website ($85), local League voter registration support ($980), print materials for local Leagues ($2,951), National Voter Registration Day ($784), and additional staff ($4,000).

19.     In 2018, LWVWI collectively hosted a total of 1,057 election-related events, including voter registration drives and candidate events. LWVWI estimated that it collectively registered or updated the registrations of 12,582 voters. Eighteen of LWVWI's 20 local Leagues noted they conduct voter registration and education at area community colleges, technical schools, and/or universities. All 20 local Leagues conduct voter registration and education at their area high schools.

20.     Additionally, in 2018, 949 of LWVWI's members and volunteers participated in election activities, for a total of 6,580 hours of volunteer time. LWVWI's local Leagues direct voters to use myvote.wi.gov to register to vote, assist with changes of address and navigating MyVote and the DMV's website, direct voters to Vote411.org to find candidate information, and ensure voters have a valid form of photo ID to obtain and cast their ballots. If anything, these figures are undercounted or under-reported.

21.     In 2019, LWVWI spent approximately $10,385 on voter registration activities statewide, including advocacy around registration form revision ($980), voter registration social media outreach ($294), National Voter Registration Day activities ($588), Disability Voter Registration Week activities ($196), voter registration trainings ($980), print materials for local Leagues ($4,326), mailing tablets to local Leagues ($21), and additional staff ($3,000).

22.     Beginning in 2020, in direct response to the threat of mass and error-prone deactivation posed by the 2019 ERIC list, Plaintiff LWVWI increased its voter registration activities throughout Wisconsin by tens of thousands of dollars. Last year, in 2020, LWVWI invested $47,800 and spent another $34,200 in 2021. Its registration-related expenditures of money, staff time, and resources have been directed at social media, paid advertising, text-banking and phone-banking voters about their voter registration status, as well as training for these efforts, and printing materials for local Leagues to use in their voter registration drives.

23.     During the 2020 election cycle, LWVWI engaged in a variety of voter registration-related activities, costing the organization money, time and resources. LWVWI spent money and other resources on the following to facilitate Wisconsinites' voter registration: printing materials for use in voter registration drives; creating a wide range of voter registration digital ads highlighting and explaining the online voter registration process; engaging volunteers for voter registration text and phone banking so that voters knew how to update their registrations, plus training volunteers on how to directly communicate with Wisconsin voters about their voter registration; training local groups on voter registration mechanics and rules, as well as creating videos on the same, including any changes to voter registration laws; and participating in National Voter Registration Day and National Disability Voter Registration Week activities.

24.     In 2021, LWVWI has again engaged in a variety of voter registration-related activities, at cost to the organization's time and resources. LWVWI expended money and other resources on the following to facilitate Wisconsinites' voter registration: voter registration digital ads, voter registration text banking and related trainings, voter registration phone banking and related trainings, voter registration trainings, a voter registration postcard campaign, assisting and training volunteers for jail-based voter registration efforts, participating in National Voter

Registration Day and National Disability Voter Registration Week activities, increasing LWVWI's availability of multilingual voter registration materials, and software training and support.

25.     Looking towards 2022, Plaintiff LWVWI anticipates expending money, time, and other resources on many of the same voter registration activities, including: voter registration digital ads, voter registration text banking and related trainings, voter registration phone banking and related trainings, voter registration trainings, a voter registration postcard campaign, printed materials for voter registration drives, and participating in National Voter Registration Day and National Disability Voter Registration Week. LWVWI anticipates investing $36,350 in the above core mission activities in 2022.

26.     Further, absent the reactivation of these 31,854 unlawfully deactivated registered Wisconsin voters, LWVWI will be injured. If this Court does not order the reinstatement of these 31,854 Wisconsin voters or if WEC does not voluntarily reverse course, Plaintiff LWVWI will be forced to divert staff time, money, and other resources from core mission activities to contact these 31,854 illegally purged Wisconsin voters by email and/or text and give them the notice of deactivation that Defendants never provided. Plaintiff LWVWI has obtained a list of all of these 31,854 voters through a previous records request to WEC. LWVWI will provide these voters with information on voter registration so that they can re-register. Accordingly, because of the unlawful deactivation of the 31,854 Wisconsin voters remaining on the 2019 ERIC list in July 2021, LWVWI's voter registration activities and the time, money, and resources they require will be higher than they would have been but for the unlawful deactivation.

27.     LWVWI's voter registration activities increased dramatically because of the threat of deactivation due to the ERIC list, starting with the 2019 ERIC list. While deactivation of the

2019 ERIC list voters was paused during the pendency of state litigation, the looming threat of deactivation caused LWVWI to make voter registration activity an even more central part of its work. The fact that the remaining 31,854 voters were ultimately unlawfully deactivated—despite LWVWI's efforts in bringing the first round of this litigation in late 2019—only confirms both the necessity of this new lawsuit and the necessity of its heightened expenditures of money and other resources devoted to voter registration activities, as described above.

28.    Inevitably, given the quantity, scope, and reach of LWVWI's voter registration activities throughout Wisconsin, on the one hand, and the tens of thousands of people that Defendants have unlawfully deactivated in violation of the Due Process Clause on the other, some portion of Plaintiff LWVWI's prospective voter registration activities and expenditures of time, money, and resources will be devoted to notifying and re-registering Wisconsin voters who were unlawfully deactivated by Defendants on July 31, 2021.

29.    LWVWI devotes a substantial part of its year-round work to registering voters in furtherance of its mission to maximize participation in Wisconsin elections and defend the rights of eligible Wisconsin voters. Part of LWVWI's core mission is to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting. Permitting this unlawful purge to remain in effect despite Defendants' non-compliance with federal constitutional due process requirements will impose significant burdens on LWVWI's interests and efforts in maximizing voter participation and civic engagement as Wisconsin heads into the 2022 election cycle. It will force LWVWI to divert time, money, and other resources to *re-registering* voters in the 2022 and 2024 election cycles that they would not have needed to re-register but for the unlawful deactivation challenged in this lawsuit. It will also

compel LWVWI to contact as many of those 31,854 illegally-purged voters as possible by email and/or text at cost to the organization's finances, staff time, and other resources.

30. Kicking over 31,000 registered Wisconsin voters off the rolls without notice and so soon before multiple elections undermines LWVWI's extensive, resource-intensive work conducting voter registration drives, including text-banking and phone-banking campaigns, throughout the state and adds to the League's burden by forcing them to notify and re-register eligible voters who were cancelled without due process. Allowing this unlawful mass deactivation to stand would clearly burden Plaintiff LWVWI's efforts to increase voter participation by adding eligible voters to the rolls and keeping them there.

31. Additionally, Defendants' own documents show that the ERIC lists contain a substantial amount of unreliable information on residential address changes. *See infra* at 24–25. Defendants' error-prone deactivations of registered voters will inevitably add to LWVWI's work by requiring the organization to expend time, money, and other resources notifying and re-registering voters who were deactivated in error.

32. Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr. are sued in their official capacities as the members of the Wisconsin Elections Commission.

33. Defendant Meagan Wolfe is sued in her official capacity as the Administrator of the Wisconsin Elections Commission.

## BACKGROUND

### *Wisconsin's Voter List Maintenance Rules and the Electronic Registration Information Center*

34. The Wisconsin Constitution provides that, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." WIS.

CONST. art. III, § 1; *see also* WIS. STAT. § 6.02(1) ("Every U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote is an eligible elector.").

35.     Wisconsin law requires an eligible elector to register in order to cast a ballot in person or by mail. *Id.* §§ 6.27, 6.85(1), 6.86(1)(a). Eligible electors may register to vote in person or by mail until 5:00 p.m. on the third Wednesday before Election Day, or online until 11:59 p.m. on the third Wednesday before Election Day. *Id.* § 6.28(1). Eligible electors who miss this deadline may register at the municipal clerk's office until close of business on the Friday before Election Day, *id.* § 6.29(a)(2), or at the polls on Election Day. *See generally id.* § 6.55. Documentary proof of residence is required to register to vote at municipal clerks' offices during the early voting period and on Election Day at the polls. *Id*. § 6.34.

36.     In 2015, the Wisconsin Legislature enacted Act 261 requiring WEC to join the Electronic Registration Information Center ("ERIC"), a non-profit organization and multi-state voter list maintenance consortium run by and for thirty states and the District of Columbia. *See* Wis. Stat. § 6.36(1)(ae)1. ERIC ingests voter registration files and government transaction data that the member states provide, namely from Departments of Motor Vehicles ("DMVs") and uses its matching methodology to identify registered voters on the rolls who appear to have moved within or to a different state or who appear to have died while out of state, as well as individuals who appear to be eligible but unregistered to vote. As part of its membership in ERIC, Wisconsin provides ERIC with information about current driver's license and ID holders and registered voters, which ERIC then compares to records from other member states and national sources like the U.S. Postal Service's National Change of Address list. Ex. 3, Wisconsin Elections Commission Memorandum, *Assessment of Wisconsin's Electronic Registration Information Center (ERIC)*

*Participation*, at 3 (Mar. 11, 2019) (hereinafter "Mar. 11, 2019 WEC Memorandum"). ERIC then aggregates this information about apparent movers and compiles it into an electronic record that it provides to the Commission (the "list" or "ERIC list"). After the matching is complete, ERIC returns a list of flagged voters to the state. *Id.*

37.     The Commission uses the ERIC list, in part, to identify those registered Wisconsin voters who appear to have changed their residential address from the address at which they are registered to vote, and to mail a letter to those voters suggesting they either confirm that their registration address is current, or if they have moved to a new municipality within Wisconsin, to update their voter registration record to their new address.

38.     ERIC provided its first list to Wisconsin in 2017. ERIC provided its second list in 2019 ("the 2019 ERIC list"). In 2019, ERIC identified 234,039 voters believed to have moved out of their municipality or to another state and sent this list to the Commission. Ex. 4, Wisconsin Elections Commission, *Excerpt from December 2, 2019 Agenda Documents*, *Wisconsin's Electronic Registration Information Center (ERIC) Movers Update*, at 2 (Dec. 2, 2019).[5] In October 2019, the Commission mailed out letters to all 234,039 registered Wisconsin voters on the 2019 ERIC list (the "2019 ERIC letter"). A copy of that letter is attached. *See* Ex. 5, Wisconsin Elections Commission, *Excerpt from September 24, 2019 Agenda Documents*, 2019 ERIC Letter, at 4 ("Sept. 24, 2019 Agenda Documents, 2019 ERIC Letter").

39.     The 2019 ERIC letter failed to provide notice of officials' intention to deactivate voters, the consequences of failing to take one of the enumerated actions, and the deadline for taking such action. For that reason, Plaintiff LWVWI filed a due process challenge in late 2019.

---

[5] The full record of the agenda documents is available on the Wisconsin Elections Commission's website at https://elections.wi.gov/sites/elections.wi.gov/files/2019-11/Open%20Session-%20December%20Final.11.26.19.pdf.

*League of Women Voters of Wisconsin, et al. v. Knudson*, No. 19-cv-1029 (W.D. Wis.). As again alleged in this new complaint, Defendants have violated due process by failing to provide the voters who received the 2019 ERIC letter with notice of the potential for deactivation and the deadline by which to take an enumerated action to avoid such deactivation.

40.     Wisconsin is one of only six states that is exempt from the entirety of the National Voter Registration Act (the "Motor Voter Law"), 52 U.S.C. §§ 20501 *et seq*. *See* 52 U.S.C. § 20503(b)(2). Of the thirty states plus D.C. participating in ERIC, only Wisconsin and Minnesota need not comply with the federal requirement to provide notice and wait for two general elections with a federal office to pass before removing from the rolls a registered voter who appears to have moved according to the U.S. Postal Service's National Change of Address information. 52 U.S.C. §§ 20507(b)(2), 20507(d)(1)(B).

41.     But Wisconsin's voter list maintenance laws differ from Minnesota's laws, leaving the former state facing a singular problem that has not plagued any other state participating in the ERIC network. Under Wisconsin law, a registered voter must be deactivated within 30 days of the date on which election officials mail the letter if there is "reliable information" that they have moved to a different municipality, Wis. Stat. § 6.50(3), whereas Minnesota only requires a registered voter's removal from the rolls if there is evidence the voter has moved to another state. Minn. Stat. § 201.12(3). Minnesota automatically updates its voter rolls for any change of address *within the state*, Minn. Stat. § 201.12(2.), while Wisconsin only automatically updates a voter's registration record for a change of address *within the same municipality*. Wis. Stat. § 6.50(3).

42.     If there is "reliable information" that a registered voter has moved from one municipality to any of the other 1,849 municipalities in Wisconsin or to another state, that voter will be queued up for deactivation within thirty days of the mailing of the notice under Wis. Stat.

§ 6.50(3). In the 2017-2018 ERIC voter list maintenance period, the Commission found that the overwhelming majority—82.6 percent—of the "movers" on the ERIC list were in-state movers. Ex. 3, Mar. 11, 2019 WEC Memorandum, at 4. The memorandum did not further disaggregate those statistics by inter- or intra-municipality movers.

43.    Wisconsin is, therefore, the only ERIC member state where election officials will deactivate a voter 30 days after notice letter is mailed, even if the voter has merely moved to a different municipality within the state. The combination of these features of Wisconsin election law makes it extremely important that, as the Due Process Clause requires, the Commission's voter roll maintenance rules and procedures afford registered Wisconsin voters notice of the steps to take to preserve their registration status and any deadlines by which to take those steps. A letter sent by election officials can only satisfy the requirements of due process if it actually provides notice, and a voter cannot be deactivated without actual pre-deactivation notice.

### *Prior litigation over WEC's failure to provide notice to 2019 ERIC list voters*

44.    When LWVWI filed its prior case two years ago in late 2019, separate litigation was proceeding in Wisconsin state court, *State ex rel. Zignego v. Wisconsin Elections Commission*, No. 2019CV449 (Ozaukee Cty. Cir. Ct.) ("*Zignego I*"). On November 13, 2019, three Wisconsin voters filed suit in Ozaukee County Circuit Court, alleging that Wisconsin law required the removal of voters on the 2019 ERIC list who did not respond to the ERIC letter within 30 days of the mailing of the letter. On December 13, 2019, ruling from the bench, the state court granted the plaintiffs' writ of mandamus and ordered the immediate deactivation of the ERIC list voters' registrations. The circuit court issued the writ of mandamus on December 17, 2019. Relying upon Wis. Stat. § 6.50(3), the court ordered the Commission to immediately deactivate the 234,039 registered Wisconsin voters flagged as potential movers, or seven percent of the state's 3,304,914

registered voters,[6] in the state's voter registration database within 30 days of the Commission's mailing of the 2019 ERIC letter.[7] *Zignego I*, Order, (Ozaukee Cty. Cir. Ct. Dec. 17, 2019). The circuit court denied a stay of its order.

45.     On January 13, 2020, the circuit court found the Commission and several Commissioners in contempt for failing to comply with its mandamus order. The circuit court ordered that the WEC and the three Commissioners could purge their contempt by complying with the writ of mandamus and imposed a forfeiture of $50 per day against the WEC and $250 per day against the individual Commissioners until they complied. *Zignego*, 396 Wis.2d at 395–98.

46.     The following day on January 14, 2020, the circuit court's mandamus and contempt orders were stayed by the court of appeals. A week later, the court of appeals issued its opinion reversing the mandamus and contempt orders. *See State ex rel. Zignego v. Wis. Elections Comm'n*, 2020 WI App 17, 391 Wis. 2d 441, 941 N.W.2d 284 ("*Zignego II*"), *aff'd as modified*, 2021 WI 32, 396 Wis. 2d 391, 957 N.W.2d 208 ("*Zignego III*"). The plaintiffs in *Zignego* sought review at the Supreme Court of Wisconsin, but no further action had been taken when the motion to dismiss *League of Women Voters of Wisconsin, et al. v. Knudson*, No. 19-cv-1029-jdp (W.D. Wis.) was considered by this Court.

47.     Plaintiff LWVWI and other individual plaintiffs filed the original federal due process challenge against the members of the WEC and its Administrator Meagan Wolfe on December 17, 2019 and moved for a preliminary injunction on December 20, 2019. *See* dkt. nos. 1, 7–12. The complaint and preliminary injunction motion argued that WEC had approved a plan to deactivate hundreds of thousands of registered Wisconsin voters flagged on a list of voters who

---

[6] This was the total at the time.
[7] Wisconsin Elections Commission, VOTER REGISTRATION STATISTICS (Dec. 2019), https://elections.wi.gov/node/6638.

had potentially moved. Plaintiff LWVWI argued that this deactivation plan violated the Fourteenth Amendment's due process clause in that it failed to provide these voters with notice that they would be deactivated if they took no action. Plaintiff LWVWI reasserts that claim in this complaint.

48.     The 2019 ERIC letter sent to voters manifestly did not inform voters that their registrations would be deactivated if they failed to take one of the enumerated suggested actions. For voters who had moved, the letter stated:

> **If you have moved**, you can register at your new address in one of these three ways:
> • Online at myvote.wi.gov; *or*
> • On Election Day at your polling place. This option requires you to provide proof of residence. Check if your polling place has changed at myvote.wi.gov or contact your municipal clerk; *or*
> • Submit a registration form to your clerk's office, in-person or by mail. A voter registration form, clerk information and proof of residence information can be found here: https://elections.wi.gov/voters/.

*See* Ex. 5, Sept. 24, 2019 Agenda Documents, 2019 ERIC Letter, at 4. For voters who had not in fact moved to a new residential address and were flagged in error on the 2019 ERIC list, the 2019 ERIC letter enumerated the following options:

> **If you still reside at this address**, please use one of the following three options below to confirm:
> • Click the gray **My Voter Info** button at myvote.wi.gov and enter your first name, last name, and date of birth then click search button. Click the green Confirm Your Address button; *or*
> • Vote at the next election; *or*
> • Sign and return the postcard at the bottom of this letter, by mail, or in person to your clerk.

*Id*. This text offered voters three mere suggestions as to how to update their voter registration addresses. None of the language was mandatory; it did not use words like "must," "shall" or "required" but merely noted that the recipient of the letter "*can register* . . . in one of these three ways." This text neither stated what the consequence of failing to confirm one's voter registration

address would be nor set a deadline by which confirmation of the voter's registration address needed to occur to avoid deactivation.

49.     Furthermore, Wisconsin voters who had not moved would have no reason to read the tear-off postcard if they were satisfied that there was no concrete obligation to update their voter registration by any deadline to remain on the rolls, or that, if they voluntarily chose to update their voter registration, that they could do so online or by voting in "the next election." But even voters who reviewed the last option—to confirm the address associated with their voter registration records by returning the detachable postcard—were required to sign a certification that read as follows: "I, [voter's name], certify I still live at [voter's address] and want to keep my voter registration active in Wisconsin." *See* Ex. 5, Sept. 24, 2019 Agenda Documents, 2019 ERIC Letter, at 4. Aside from the fact that this postcard's certification language would likely be read by only the subset of recipients who contemplated choosing that option, this statement also wholly failed to communicate that deactivation necessarily would result if the voter failed to take one of the enumerated actions in the letter. "Active" is a legal term of art that does not clearly inform a lay voter that they will be removed from the rolls if they fail to take one of the specified actions in response to the letter. Moreover, "please use one of the following three options" is not mandatory language but constitutes a mere request. None of this letter's text provided notice that deactivation would result if the voter failed to take action.

50.     During the brief life of that prior litigation, Defendants and their counsel maintained that no due process violation could have occurred because no deactivation plan had been adopted. Indeed, in their motion to dismiss this action as unripe, *see* dkts. 41–42, they said: "[T]he Commission as of the date of this filing has adopted no plan to deactivate any voter registrations." *See* dkt. 42 at 3; *id*. at 11 ("Apart from that order [in the *Zignego* state court litigation], the

Commission has never approved a deactivation plan based on the most recent ERIC data, whether immediately, within 12 to 24 months, or otherwise.") (record citations omitted); *id*. at 5 n.2 ("Plaintiffs assert that the Commission adopted a 'policy' of deactivating voters after a 12 to 24 month period . . . The Commission did not adopt the recommendation, so it remains just that—a recommendation."). Indeed, the Commissioners told this Court, the very reason "the mailing did not address potential deactivation as a consequence of not responding to the mailing" was "[b]ecause the Commission had not approved deactivations[.]" *Id*. at 6.

51.     Defendants contended that, not only was it speculative whether any deactivations would ultimately occur, but that it was also speculative of Plaintiffs to argue that no further mailing would be sent to these voters prior to their deactivation. *See* dkt. 42 at 2–3 ("[I]t remains speculative whether any deactivations will occur and, if so, what notice, if any, would . . . accompany them."). Defendants' counsel themselves speculated that "the Commission may well decide to give notice of any deactivations that may ultimately occur." *Id.* at 3. WEC represented to this Court that it "ha[d] said nothing about what notice will accompany deactivations, if any," as if a further letter containing notice might be approved by a majority of Commissioners and sent in the future. *Id*. at 13. Now it is clear that no such notice was provided prior to the deactivation of the remaining 31,854 voters on the 2019 ERIC list.

52.     LWVWI argued strenuously that Defendants' representations were contradicted by the minutes and a video recording of the Commission's June 2019 meeting, at which the deactivation plan was adopted. This argument was made in detail at pages 1 through 5 and 9 through 12 of its Corrected Opposition to the Motion to Dismiss. *See* dkt. 57 at 1–5, 9–12.

53.     On April 2, 2020, this Court agreed with Defendants' counsel that it was too soon to tell if deactivations would proceed in the future, after the *Zignego* state court litigation was

resolved, and if further notice would precede those deactivations. Accordingly, this Court dismissed this case as unripe, writing:

> Plaintiffs say that their claims are ripe regardless of the outcome of the state-court litigation because in June 2019, before the state court litigation arose, the Wisconsin Election Commission adopted a plan to deactivate the registrations of the subject voters on a 12- to 24-month timeline. According to plaintiffs, deactivating voters in accordance with this plan would violate voters' due process rights because the Commission has not yet provided adequate pre-deactivation notice. The Commission disputes this version of events. It says that although it issued a memo in June 2019 that discussed a possible plan for future deactivations, *see* Dkt. 11-2, that memo was not a definitive deactivation plan. The Commission emphasizes that it hadn't yet adopted any firm plan for deactivating the registrations of the subject voters, nor had it made determinations about what notice would be provided in connection with any such deactivations.
>
> In any event, the precise status of the Commission's plan for eventual deactivations isn't relevant now: that plan was upended by the state-court litigation, and neither party contends that the Commission can move forward with deactivations while the litigation remains pending. Plaintiffs cannot bring a challenge based on speculation about what the Commission might do after the litigation resolves. And even setting aside the state court litigation, the court would conclude that plaintiffs' challenge to the Commissions' 12- to 24-month deactivation plan is unripe *because the Commission has never indicated that it is planning to deactivate voter registrations without first providing notice.*

*See* dkt. 62 at 2–3 (emphasis added). In reliance upon Defendants' unambiguous and consistent representation that no deactivation plan had been approved and that voters might well receive notice in the future if a concrete deactivation plan were to be adopted, this Court dismissed Plaintiff LWVWI's prior action. Dkt. 62.

### *The July 31, 2021 deactivation of the 2019 ERIC list voters*

54.     On April 9, 2021, the Supreme Court of Wisconsin affirmed the Court of Appeals decision in *Zignego II* that reversed the writ of mandamus, finding Wis. Stat. § 6.50(3) did not impose a clear duty on the Wisconsin Elections Commission to deactivate voters for whom there is "reliable information" of a residential address change to another municipality or state. *See Zignego III*.

55.     When the Commission met in June of 2021, the Commissioners discussed what to do with the registered Wisconsin voters remaining on the 2019 ERIC list. After the April 2021 spring election, 69,441 active voters remained on the 2019 ERIC list and, "[o]f those, 37,587 were already scheduled to be deactivated as part of Four-Year Voter Record Maintenance on July 31 because they had not voted in four years or responded to the postcard mailing." Ex. 2, Aug. 4, 2021 Press Release, at 3. 31,854 voters would remain after the four-year list maintenance process was completed. *See id*. at 3–4; Wis. Stat. § 6.50(1). The 31,854 remaining individuals, therefore, had voted in Wisconsin within the last four years but had not voted within the last two years since the 2019 ERIC list letters were mailed out. Had they voted in the last two years, they would have necessarily confirmed or updated their registration addresses and been taken off the 2019 ERIC list. During the June meeting, every motion the Commissioners proposed failed, as consensus over WEC's past and future actions with respect to the 2019 ERIC list voters remained elusive. Contentious discussion ensued about the scope and effect of the adopted motion from the June 2019 Commission meeting, but the Commissioners could not resolve their dispute. The Commissioners appeared divided on whether they had previously approved deactivation after a 12-to-24-month waiting period, and WEC's Commissioners and WEC staff, including Administrator Meagan Wolfe, did not state during the public portion of that meeting that deactivation of the remaining 31,854 voters on the 2019 ERIC list would be forthcoming on July 31, 2021.

56.     Subsequently, on July 31, 2021, the Commission deactivated the 31,854 voters remaining on the 2019 ERIC list. This action was taken without a new majority vote of the Commissioners, without the mailing of a new letter to voters, and without prior notice to the public.

57.     Defendants' counsel's October 5, 2021 letter concedes that there had been an approved deactivation plan for the 2019 ERIC list voters and deems their prior representations to this Court "inadvertent misstatements" and "based on an incomplete understanding of Commission deliberations." Dkt. 64 at 1–2.

58.     This mass deactivation was carried out on July 31, 2021, in sole reliance upon the vote the Commissioners took back in June 2019 and without providing these voters with any additional letter. In an August 4, 2021 press release, the Commission staff announced this news as follows:

> At its June 2, 2021 meeting, the Commission considered what to do with those 31,854 voters and whether to modify its June 2019 directive to deactivate them. After an extensive discussion, there were not four votes to modify the June 2019 directive, so the Commission took no action. As a result, the WEC's 2019 directive prevailed and on July 31 the remaining voters were deactivated.

Ex. 2, Aug. 4, 2021 Press Release, at 3–4.

59.     The 2019 ERIC letter remained the one and only mailing to these 31,854 deactivated voters, and it did not inform these voters of the following essential information: (1) the WEC's intention to deactivate their voter registrations; (2) the consequences of failing to take one of the enumerated actions; and (3) the deadline for taking such action. These voters were not given notice that inaction would result in their deactivation. Accordingly, these voters were deprived of their right to procedural due process, which at a bare minimum requires notice and an opportunity to be heard *prior to* the deprivation of a right or statutory entitlement—here, continued voter registration.

60.     Defendants' counsel at the Wisconsin Department of Justice already conceded this due process violation at the December 13, 2019 hearing on the motion for a writ of mandamus in the circuit court action: "[The ERIC letter] does not provide any notice of deactivation, in thirty

days or otherwise . . . this would change the status quo, deactivate registered electors without any

notice." Ex. 1, *Zignego* Hr'g Tr., at 59:23–60:2. Defendants' counsel further explained that:

> [The Commissioners] weren't planning to deactivate these – these voters . . . Under
> the ERIC mover agreement, they have to reach out to voters and let them know that
> there was – there's been some indication that they might have moved . . . [T]hat's
> all that this notice was doing. It was not saying in thirty days you're gonna be
> deactivated, it wasn't saying at some point you're gonna be deactivated, it was
> saying here are the steps you can take to . . . update the voter rolls, help us update
> the voter rolls.

*Id*. at 61:4–17; *see also id*. at 59:22–60:2 ("That is a complete change of the status quo . . . because

the 2019 mailing . . . was a new process, it – it does not provide any notice of deactivation or

otherwise . . . so the . . . this would – this would change the status quo, deactivate registered electors

without any notice.").

61.     In their motion to dismiss the prior due process challenge before this Court,

Defendants again conceded the letter failed to give notice of deactivation to the 2019 ERIC list

voters. They stated that the 2019 ERIC letter "did not address potential deactivation as a

consequence of not responding to the mailing." *See* dkt. 42 at 3. This admission of the 2019 ERIC

letter's failure to provide notice of deactivation, combined with the now-accomplished

deactivation of the remaining 2019 ERIC list voters and the lack of any notice over the two years

preceding that deactivation, are dispositive of this action. Together, these undisputed facts clearly

establish a procedural due process violation.

### *The unreliability of the ERIC data provided to Defendants*

62.     The lack due process afforded to the remaining 31,854 voters on the 2019 ERIC

list is particularly problematic because it is known that the ERIC data provided to Defendants is

unreliable and therefore over-inclusive. In prior years, the ERIC data for Wisconsin has included

a substantial portion of false positives.

63.     In 2017, the ERIC list indicated that 282,448 registered voters had moved within the state. Ex. 3, Mar. 11, 2019 WEC Memorandum, at 4. Of these voters, 6,153 had not moved and, accordingly, they confirmed their addresses. *Id*. Another 12,133 had their registrations reactivated. *Id.* at 5. A further 5,984 voters used the Supplemental Movers Poll List to confirm their existing registration addresses at the polls throughout elections from April to November of 2018. *Id.* All told, this reflected a substantial error rate for the 2017 ERIC list. After raising concerns about the reliability of the 2017 movers list, clerks or commissions in three municipalities, including the City of Milwaukee, City of Green Bay, and Village of Hobart, reactivated a total of 38,430 voters, 2,357 or 6.87 percent of whom voted at the addresses listed on their registrations. *Id.* at 6.

64.     A subset of the 234,039 registered Wisconsin voters on the original 2019 ERIC list had not in fact moved from the residential address listed on the 2019 ERIC letter mailed to them. Indeed, at the time of the deactivation of the 31,854 voters on July 31, 2021, WEC's own data reflected that 16,390 registered Wisconsin voters—7.07 percent of the total on the 2019-2020 ERIC list—had ultimately proven to be false positives.[8]

### *Ease of reactivation*

65.     At the June 10, 2021 WEC meeting, Defendant Commissioner Dean Knudson stated that the 31,854 deactivated Wisconsin voters who remained on the 2019 ERIC list can be easily reactivated by WEC staff. Commissioner Knudson stated: "[O]ur staff has told us in the past

---

[8] Ex. 6, Wisconsin Elections Commission, June 2, 2021 Meeting Memorandum on ERIC Processes, at 5, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2021-06/E.%20ERIC%20Commission%20Memo%206.2.21%20-%20Copy.pdf.

that it's very easy for them with the push of a button to do the deactivation and do the reactivation. We've done it before. We can do it again."[9]

## CLAIMS

### COUNT ONE
### (Violation of Procedural Due Process, Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)

66.     The factual allegations contained in paragraphs 1 through 65 are incorporated into Count One, as though fully set forth herein.

67.     The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. At a minimum, "[t]o meet the requirements of due process, the state must afford notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Morrell v. Mock*, 270 F.3d 1090, 1095 (7th Cir. 2001) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

68.     Courts tasked with reviewing procedural due process claims face two questions: "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?" *Simpson v. Brown Cty.*, 860 F.3d 1001, 1006 (7th Cir. 2017). Answering these questions requires balancing three interests: "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's countervailing interests." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

69.     The Seventh Circuit has held that due process requires pre-deprivation procedures except in cases of emergencies or when the government conduct at issue is "random and

---

[9] Video of Wisconsin Elections Commission Meeting (June 10, 2021), at 4:42:58–4:43:08, *available at* https://elections.wi.gov/node/7447.

unauthorized." *Simpson*, 860 F.3d at 1010. Neither of those conditions is met here, so post-deprivation notice of removal cannot satisfy minimum due process requirements. The fact that Wisconsin law offers erroneously-removed voters the opportunity to re-register in various ways, including at the polls on Election Day, does not cure the due process violation caused by the wrongful cancellation of their registrations.

## Statutory Entitlement

70.     A liberty or property interest that is governed by due process can be created by the Constitution or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Courts analyze whether a statutory entitlement existed prior to the notice and process afforded and prior to the deprivation.

71.     Wisconsin law creates a statutory entitlement in one's voter registration, by guaranteeing the right to register and cast a ballot to every U.S. citizen above the age of 18 who is a resident of the state and who registers to vote in accordance with the procedures established under state law and regulations. Wis. Stat. § 6.27 ("Each elector shall register under this chapter before voting in any election . . . ."); *see also* Wis. Stat. § 6.29 ("No names may be added to a registration list for any election after the close of registration, except as authorized under this section or s. 6.55(2) or 6.86(3)(a)2. Any person whose name is not on the registration list but who is otherwise a qualified elector is *entitled to vote at the election upon compliance with this section*, if the person complies with all other requirements for voting at the polling place.") (emphasis added). Eligible, registered voters also enjoy an "individual and personal" right to vote under Wisconsin law. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)); *see also Luft v. Evers*, 963 F.3d 665, 669 (7th Cir. 2020) ("[T]he right to vote is personal."). Having established such an entitlement, the state may not

deprive an individual of it without complying with the due process clause. *Frederick v. Lawson*, 481 F. Supp. 3d 774, 788–80 (S.D. Ind. 2020).

72.     Wisconsin law entitles any registered voter to cast ballots in any way the voter qualifies to vote. As an example, all registered Wisconsin voters are entitled to vote by mail-in absentee ballot, if the voter files a request by the deadline mandated in state law. *See* WIS. STAT. § 6.20.

### Risk of Erroneous Deprivation of Statutory Entitlement

73.     By the admission of Defendants and their counsel, the 2019 ERIC letter failed to provide any notice that deactivation would result from the voter's failure to take one of the suggested, enumerated actions. The letter did not explain to voters the consequences of inaction; nor did it provide notice of the deadline to take that action. As Defendants' counsel have previously stated, the letter was not intended to notify voters of potential deactivation but merely as a request to voters to help Defendants update the statewide voter database and improve its accuracy.

74.     Because Defendants had in fact approved a plan to deactivate voters, the failure to communicate that fact in the 2019 ERIC letter created an obvious risk of erroneous deprivation, as voters who had not moved would not know there was an obligation to respond or otherwise take one of the enumerated actions. That lack of notice—as to both the consequence of deactivation and the deadline by which the voter would need to take action—increased the likelihood that voters who had not moved to a new residential address would not take the requisite steps needed to confirm their registration addresses, and in turn, the likelihood that their registrations would be deactivated.

75.     Moreover, the risk of erroneous deprivation was greatly magnified by the error rate in the ERIC lists provided to Wisconsin, including the 2019 ERIC list, as documented in

Defendants' own memoranda. Prior to the July 31, 2021 deactivation, WEC's own data show that 16,390 voters or 7.07 percent of the total numbers of voters on the ERIC list given to Defendants in 2019 ultimately confirmed that they had not in fact moved and had been flagged for deactivation in error.

76.     Plaintiff LWVWI asserts this claim because this change in election laws will cause people to lose their registration status and force LWVWI to divert time, resources, and money to prospectively notify and re-register voters who were deactivated without notice, particularly those who have not moved from the residential address and were identified as movers in error.

### Government Interest

77.     Defendants cannot advance any interests that outweigh the risk of erroneous deprivation of an eligible, duly registered Wisconsin voter's right to continued registration. In assessing governmental defendants' interests, courts also consider "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (quoting *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013)). Plaintiffs do not dispute Defendants' interest in conducting voter list maintenance or ensuring fair election administration or compliance with state law. Defendants have an equally weighty interest in meeting federal constitutional requirements, and they lack any legitimate interest in deactivating these 31,854 registered Wisconsin voters without notice.

78.     For the foregoing reasons, Defendants have violated and will continue to violate procedural due process, as guaranteed by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983. At all relevant times, Defendants have acted under color of state law.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that Defendants' deactivation of 31,854 registered Wisconsin voters without affording them notice and an opportunity to respond violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

(c) Issue a permanent injunction that requires Defendants to reactivate all of the 31,854 2019 ERIC list voters whose voter registration records were deactivated on July 31, 2021;

(d) Grant Plaintiff LWVWI its reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(e) Grant such other relief as this Court deems just and proper.

DATE: December 22, 2021                    Respectfully submitted,

                                           */s/ Jon Sherman*

                                           Jon Sherman
                                           D.C. Bar No. 998271
                                           Michelle Kanter Cohen
                                           D.C. Bar No. 989164
                                           Cecilia Aguilera
                                           D.C. Bar No. 1617884
                                           Fair Elections Center
                                           1825 K St. NW, Ste. 450
                                           Washington, D.C. 20006
                                           jsherman@fairelectionscenter.org
                                           mkantercohen@fairelectionscenter.org
                                           caguilera@fairelectionscenter.org
                                           (202) 331-0114

                                           Daniel S. Lenz, SBN 1082058
                                           Law Forward, Inc.
                                           222 West Washington Avenue, Suite 250
                                           P.O. Box 326
                                           Madison, WI 53703-0326
                                           dlenz@lawforward.org
                                           (608) 556-9120

Douglas M. Poland, SBN 1055189
Jeffrey A. Mandell, SBN 1100406
STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
dpoland@staffordlaw.com
jmandell@staffordlaw.com
(608) 256-0226

*Counsel for Plaintiff*